J-S57045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.D.F., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.J.W., MOTHER | No. 1338 EDA 2014 |

Appeal from the Decree entered March 24, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000491-2013, CP-51-CP-0076647-2004,
FID-FN-379826-2009

| | |
|---|---|
| IN THE INTEREST OF: R.T.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.J.W., MOTHER | No. 1339 EDA 2014 |

Appeal from the Decree entered March 24, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No: CP-51-AP-0000492-2013, CP-51-CP-0076648-2004,
FID-FN-379826-2009

BEFORE: DONOHUE, MUNDY, and STABILE, JJ.

MEMORANDUM BY STABILE, J.: **FILED OCTOBER 29, 2014**

R.J.W. (Mother) appeals from the decrees entered March 24, 2014, which terminated involuntarily her parental rights to her minor children

A.D.F., born in February of 2002, and R.T.W., born in July of 2003.[1] We affirm.

The trial court summarized the relevant factual and procedural history of this case as follows.

> On March 5, 2010, the Honorable Donna Woelpper awarded Permanent Legal Custody ("PLC") of [A.D.F.], [R.T.W.] and their sibling E.R., to their maternal great-aunt, O.W.
>
> On April 27, 2011, the Department of Human Services ("DHS") received a General Protective Services Report stating O.W. was no longer willing to care for the three children. The Report also stated that O.W. told the children she was going to return them to the care of DHS. The Report further stated: O.W. verbally abused the children; family members offered to care for the children, but O.W. refused; and O.W. planned a trip for May 2011 and looked for someone to care for the children while away.
>
> On the same day, DHS visited the children at Laura H. Carnell School. The children denied the Report's statements stating they got along with O.W. DHS talked to the school counselor who stated the children had no behavioral issues at school and school officials believed that O.W. resented caring for the children. The school counselor further stated that O.W. insisted E.R. needs special education classes; however, the school determined E.R. was on target scholastically and did not require special education services.
>
> Later that day, DHS visited O.W.'s home. O.W. said she was no longer willing to care for the children because of being physically, mentally and emotionally unable to do so. O.W. informed DHS that if the children were not out of the home by the following day, she would drop them off at the local police department.

---

[1] The parental rights of A.D.F.'s father, L.F., and R.T.W.'s father, M.J., were terminated by separate decrees entered on the same date. Neither father is a party to the present appeal.

DHS learned family friend, V.R., planned to care for the children at home that weekend. V.R. agreed to care for the children until DHS located suitable placements for them.

On May 2, 2011, DHS obtained an Order of Protective Custody ("OPC") for the children. DHS placed E.R. in the care of her paternal great-aunt, R.J. [A.D.F.] was placed in the care of her paternal grandmother, A.F. [] [(Grandmother)]. [R.T.W.] was placed in the care of family friend, C.S. [(Family Friend)].

At the Shelter Care Hearing on May 4, 2011, the OPC was lifted and the temporary commitment to DHS was ordered to stand. The whereabouts of Mother were unknown at the time to DHS. [A.D.F.]'s father, L.F., was residing at Joseph E. Coleman Hall, a halfway house. The identity and whereabouts of [R.T.W.]'s father were unknown to DHS.

[R.T.W.]'s father was later identified as M.J.

At the Adjudicatory Hearing on May 13, 2011 held before the Honorable Flora Barth Wolf, the temporary commitment to DHS was discharged, and the children were adjudicated dependent and committed to DHS. Judge Wolf further ordered: Mother be referred to the Clinical Evaluation Unit ("CEU") for a forthwith drug and alcohol screen and dual diagnosis assessment; Mother be referred to the Achieving Reunification Center ("ARC"); Mother to be granted supervised visits at the agency, where the visits could be modified before the next court date; and DHS attempt to locate L.F. and M.J.

At the Permanency Review Hearing on August 11, 2011 held before Juvenile Master Christine Adair, the [c]ourt ordered the children remain as committed to DHS, and DHS refer [A.D.F.] and [R.T.W.] to the Behavior Health System ("BHS") for appropriate intervention. The [c]ourt found Mother non-compliant with the Permanency Plan.

The initial Family Service Plan ("FSP") meeting was held on November 2, 2011, at which time the goal for the children was reunification. Mother, L.F. and M.J. did not participate. The FSP objectives for Mother were stated as: 1) to participate in ARC for parenting education, budgeting assistance, and housing; 2) to participate in all visits with [A.D.F.] and [R.T.W.]; 3) to improve

- 3 -

her relationship with the children; 4) to understand age-appropriate behavior; and 5) to maintain appropriate housing with suitable space, heat, electric and hot water service, and all other operable utilities. The FSP objectives for L.F. and M.J. were to make their whereabouts known to DHS.

At the Permanency Review Hearing on November 18, 2011 held before Juvenile Master Tammy Langenberg, the Court ordered the children remain as committed to DHS, and Mother's supervised visits continue as previously arranged. The [c]ourt found Mother moderately compliant with the Permanency Plan.

At the Permanency Review Hearing held before the Honorable Thomas M. Nocella on February 17, 2012, the [c]ourt ordered: the children remain as committed to DHS; Mother be referred to CEU for a forthwith drug screen and dual diagnosis assessment; if Mother secured appropriate housing, the children could be reunited with her prior to the next court date by agreement of the parties; and Mother's supervised visits continue.

On April 21, 2012, ARC closed its case because of Mother's non-participation.

At the Permanency Review Hearing held before Master Carol Carson on May [1]7, 2012, the [c]ourt ordered the children remain as committed to DHS. The [c]ourt further ordered: Mother to be referred to CEU for a forthwith screen, assessment and monitoring; Mother be granted weekly supervised visits with the children; and that L.F. and M.J. be offered liberal supervised visits with their respective children. The [c]ourt noted Mother's non-compliance with the Permanency Plan.

At the Permanency Review Hearing on February 5, 2013, [the trial c]ourt ordered the children remain as committed to DHS. [The trial c]ourt also ordered: Mother to complete drug, alcohol and mental health treatment; Mother be re-referred to CEU for a forthwith screen and assessment; visits with the children continue; and Mother to be offered supervised visits at the agency and [Family Friend]'s home.

On March 15, 2013, DHS held an FSP Revision Meeting, and the goal for the children was changed to adoption. None of

the parents attended the FSP Meeting. FSP objectives for the parents remained the same.

At the Permanency Review Hearing on July 1, 2013, [the trial c]ourt ordered that the children remain as committed to DHS, and the children's placement plans were changed to adoption. [The trial c]ourt noted Mother's noncompliance with the Permanency Plan. [The trial c]ourt ordered Mother's visitation rights remain the same.

Trial Court Opinion, 5/29/14 at 2-8 (citations to the record omitted).

On September 9, 2013, DHS filed petitions to terminate Mother's rights to the children, and a termination hearing was held on December 17, 2013. The trial court deferred its decision until a second hearing, which was held on March 24, 2014. The court entered decrees terminating Mother's rights that same day. Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 20, 2014, this Court consolidated Mother's appeals *sua sponte*.

Mother now raises the following issues.

A. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8)?

B. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 4 (some capitalization and trial court answers omitted).

We consider Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > ***
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1). To

meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). ***Id.*** (quoting ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998)).

This Court has emphasized that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting ***In re C.M.S.***, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***Id.*** (citing ***In re Adoption of Dale A., II***, 683 A.2d 297, 302 (Pa. Super. 1996)).

Instantly, Mother argues that her parental rights should not have been terminated based on her testimony at the first of her two termination

hearings. Mother's Brief at 12. At the hearing, Mother testified that she completed the "main goals that I was supposed to accomplish" in order to maintain her parental rights. N.T., 12/17/13, at 23. Specifically, Mother stated that she obtained housing and a "parenting certificate."[2] *Id..* Mother admitted that she was no longer receiving mental health treatment, but claimed that she did not need medication, and that her job prevented her from continuing with therapy or obtaining drug and alcohol assistance. *Id.* at 20-21, 25.

Concerning visitation, Mother admitted that she had not had custody of the children "out of the last five years," and that she had not scheduled a supervised visit in the past year. *Id.* at 26, 29. However, Mother alleged that the reason she was not having visits with DHS was because "[t]hey were not bringing the children to the visits" when they were scheduled. *Id.* at 27. Mother also claimed that she visited with her children at the homes of their foster parents frequently. Mother claimed, "I always go and see my

---

[2] In her brief, Mother states that her "Primary FSP objectives were parenting classes, visitation, and housing." Mother's Brief at 11. According to Mother, her additional goals of mental health treatment and drug and alcohol treatment "were not part of the initial Family Service Plan and it is not clear when DHS amended the Permanency Plan to include these goals." *Id.* at 12. As noted by the trial court in its opinion, *supra*, the court entered permanency review orders on February 4, 2013, requiring Mother to "complete drug & alcohol /mental-health [*sic*] treatment." Permanency Review Order, 2/4/2013, at 1. The orders were entered on the docket on February 4, 2013, but dated February 5, 2013, which is the date used by the trial court.

children where they reside at. They may not tell them all the times I come there, but I see my children a lot. I talk to my children on the phone. I am the one who does my girl's hair." *Id.* at 21.

In contrast, the trial court concluded that the evidence presented at Mother's termination hearings "demonstrates Mother's ongoing unwillingness to provide care or control for the children or perform any parental duties and her failure to remedy the conditions that brought the children into care." Trial Court Opinion, 5/29/14, at 10. The trial court reasoned that Mother had failed to complete her FSP objectives satisfactorily, and that Mother "will not be able to provide adequate care for the children in the foreseeable future." *Id.* at 10-11.

Our review of the record supports the trial court's findings under Section 2511(a)(1). Concerning Mother's completion of her FSP objectives, DHS social worker Tyrone King indicated that Mother had not completed any programs at the ARC, nor did she ever "participate regularly" in a drug and alcohol program, comply with a mental health treatment program, or participate in visitation. *Id.* at 16-17. Mr. King acknowledged that Mother did have suitable housing. *Id.* at 16.

Foster care social worker Iesha Robinson testified in greater detail about Mother's failure to visit with the children. Ms. Robinson stated that Mother was offered biweekly supervised visits with the children, but that Mother had failed to attend any of her visits for the past year. *Id.* at 9.

Mother also failed to contact Ms. Robinson about the children, or to send "any letters, gifts, or cards." *Id.* at 13. Ms. Robinson admitted that Mother "maybe made two or three visits throughout the last six months in the home" of the children's foster parents. *Id.* at 14.

As a result of Mother's testimony that she often visited with the children at the home of their caregivers, the trial court deferred its decision on whether to terminate Mother's parental rights until a second termination hearing. At the second hearing, the children's foster parents were called to testify. Family Friend testified that Mother was not visiting at her home regularly. N.T., 3/24/14, at 6 ("The first year, she visited. But after that no."). Family Friend stated that Mother's last visit was November of 2013. *Id.* at 6. Prior to November, it was "maybe eight months to a year" between visits. *Id.* at 7. Family Friend indicated that Mother did not "call frequently" to ask about R.T.W., nor did she write letters or send gifts, cards, or financial support. *Id.* Family Friend recounted, "I used to call [Mother]. And plead, Call your daughter, your daughter wants to talk to you." *Id.* at 8. Similarly, Grandmother testified that Mother had not visited A.D.F. at her home since 2011, although Mother had called about A.D.F. twice in the last month. *Id.* at 13. Grandmother indicated that Mother had provided a gift and a card to A.D.F. for her first birthday while in Grandmother's care, but nothing since. *Id.* at 14.

In sum, the record confirms the trial court's conclusion that Mother has failed or refused to perform parental duties with respect to the children. During the six months leading up the filing of the termination petitions, Mother had minimal, if any, contact with them. The record also demonstrates that Mother has failed to complete the majority of the FSP objectives that would have allowed the children to be returned to her care. While Mother offered conflicting testimony that she visited with the children frequently, the trial court was free to weigh this testimony and reject it as incredible. Thus, we conclude that the trial court did not abuse its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1).

Next, we consider whether termination was proper under Section 2511(b). The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

With respect to the bond analysis pursuant to Section 2511(b), our Supreme Court has explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." **T.S.M.**, 71 A.3d at 267. "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **Id.** at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

Here, Mother argues that it would not be in the best interests of the children to terminate her parental rights, and cites to her testimony during the first termination hearing that she is bonded with the children. Mother's Brief at 14. At the hearing, Mother testified, "Me and my children, we love each other. Nothing can separate me and my children. My children love me with all their heart. And, I love my children with all my heart." N.T., 12/17/13, at 22.

In response, the trial court concluded that the children are bonded with their foster parents, and that they have no strong bond with Mother. Trial Court Opinion, 5/29/14, at 11-13. The court reasoned, "because there

was not a strong bond between Mother and her children, terminating Mother's parental rights would not cause the children irreparable harm and would be in the best interest of the children." *Id.* at 11-12.

Again, our review of the record supports the trial court's assessment. Ms. Robinson testified that she observed A.D.F. in the pre-adoptive home of his caregiver, Grandmother, "[a]t least once or twice a month," for the past two years. N.T., 12/17/13, at 9-10. Ms. Robinson stated that A.D.F. and Grandmother have "a really good relationship," and that they "love" each other. *Id.* at 10. She explained that there were no issues or concerns with Grandmother, and that A.D.F. was safe in her home. *Id.* Ms. Robinson agreed that A.D.F. would not suffer any "irreplicable [*sic*] harm" if Mother's rights were terminated. *Id.* at 11.

With respect to R.T.W., Ms. Robinson testified that the child had been in the pre-adoptive home of her caregiver, Family Friend, "probably for the last two years," and that she visited R.T.W. "twice a month." *Id.* at 11-12. Ms. Robinson stated that the two "have a good relationship." *Id.* at 11. Ms. Robinson agreed that they have what "is akin to a parent and child bond," and that R.T.W. "loves" Family Friend, and knows that she is safe with her. *Id.* at 12. Ms. Robinson stated that R.T.W. "loves her mother as well." *Id.* However, she indicated that R.T.W. would not be "directly harmed" if Mother's rights were terminated. *Id.*

In a similar manner, Mr. King testified that A.D.F. and Grandmother have a "stable, positive, nurturing and loving relationship." *Id.* at 17. With regard to R.T.W., Mr. King stated that she and Family Friend have "a positive bond," that he did not believe that either of the children would be harmed if Mother's parental rights were terminated. *Id.* Family Friend testified that she had been "meeting all of [R.T.W.]'s needs," that R.T.W. wanted to stay with her, and that she wanted to adopt R.T.W. N.T., 3/24/14, at 5-6. Grandmother testified that she has been making sure all of A.D.F.'s needs are met, and that A.D.F. was "doing very good," and was "happy." *Id.* at 12-13. Grandmother agreed that she was holding herself out as "a preadoptive resource should [A.D.F.] become available." *Id.* at 13.

Therefore, the testimony presented during Mother's termination hearings confirms that the children are bonded with their respective caregivers. Given that Mother visits with the children only rarely, and makes no other effort to be in contact with them, it was reasonable for the trial court to conclude that the children do not have a strong bond with Mother, and that they would not suffer irreparable harm if Mother's rights were terminated. To the contrary, we agree with the trial court that it is in the children's best interest to be adopted by their current foster parents, so that the children can finally enjoy the permanency and stability that they have been denied by Mother.

Accordingly, because we conclude that the trial did not abuse its discretion by terminating the parental rights of Mother pursuant to Sections 2511(a)(1) and (b), we affirm the decrees of the trial court.

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/29/2014